# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. CR-23-130-G |
| | ) |
| TYLER RAY BAKER, | ) |
| | ) |
| Defendant. | ) |

## ORDER

Now before the Court is a Motion to Dismiss Indictment (Doc. No. 22) filed through counsel by Defendant Tyler Ray Baker. The Government has filed a Response (Doc. No. 26). Having reviewed the parties' filings, the Court makes its determination.

### I.   Background

On July 18, 2018, Defendant entered a guilty plea in the District Court of Cleveland County, Oklahoma, to three felony charges: (1) Pattern of Criminal Offenses, (2) Domestic Assault and Battery by Strangulation, and (3) Kidnapping. *See* Gov't's Resp. (Doc. No. 26) at 1-2; *State v. Baker*, No. CF-2016-1780 (Cleveland Cnty. Dist. Ct.).[1] Following his guilty plea, Defendant was placed on a five-year deferred sentence. *See* Gov't's Resp. at 1-2; *Baker*, No. CF-2016-1780.[2]

---

[1] The state-court docket is publicly available at https://www.oscn.net (last visited Jan. 2, 2024).

[2] Under Oklahoma law, a court may defer the entry of a judgment and imposition of a sentence while the defendant abides by court-imposed conditions. *See* Okla. Stat. tit. 22, § 991c(A). In April of 2023, the State moved to accelerate the deferred judgment and sentence. *See Baker*, No. CF-2016-1780.

On April 4, 2023, a federal grand jury returned a single-count Indictment against Defendant, charging him with Illegal Receipt of a Firearm by a Person Under Indictment in violation of 18 U.S.C. § 922(n).  *See* Indictment (Doc. No. 1).  Specifically, the Indictment charges that "[b]etween on or about January 22, 2023, and on or about February 3, 2023, the exact date being unknown to the grand jury, within the Western District of Oklahoma, [Defendant], with knowledge he was under Indictment in Cleveland County District Court case number CF-2016-1780 for a crime punishable by a term of imprisonment exceeding one year, willfully received a firearm."  *Id.* at 1.

Defendant now moves to dismiss the Indictment, arguing that 18 U.S.C. § 922(n) is facially unconstitutional under the Second Amendment of the United States Constitution and *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022).  *See* Def.'s Mot. (Doc. No. 22) at 1.

II. *Applicable Law*

"Rule 12(b)(3) of the Federal Rules of Criminal Procedure permits a defendant to challenge an indictment before trial where a 'trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense.'" *United States v. Kays*, 624 F. Supp. 3d 1262, 1264 (W.D. Okla. 2022) (quoting *United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010)); *see also* Fed. R. Crim. P. 12(b)(1), (b)(3)(B).  Defendant does not dispute that the Indictment states an offense under § 922(n).

Rather, Defendant argues that § 922(n) is unconstitutional, citing the standard recently articulated by the United States Supreme Court in *Bruen*.

Although Defendant does not explicitly state that his challenge is a facial challenge, Defendant's Motion only discusses § 922(n)'s facial validity and makes no argument regarding the statute as applied to Defendant's specific circumstances. A facial challenge to § 922(n)'s constitutionality under the Second Amendment is a matter of law to be decided before trial. *See Kays*, 624 F. Supp. 3d at 1264. A party succeeds in a facial challenge "by establishing that no set of circumstances exists under which [the law] would be valid, *i.e.*, that the law is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (alteration and internal quotation marks omitted).

### III. Discussion

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *Bruen*, the Supreme Court outlined the following test for determining whether a law that regulates firearms is nevertheless valid:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must

then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.

*Bruen*, 597 U.S. at 24.

> A. <u>Whether the Second Amendment's Plain Text Covers Defendant's Conduct</u>

Section 922(n) prescribes: "It shall be unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to ship or transport in interstate or foreign commerce any firearm or ammunition or receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(n).

Defendant argues that the conduct prohibited by § 922(n) is protected conduct under the Second Amendment, asserting that (1) he is part of "the people" as set forth in the text of the Amendment and (2) the act of receiving a firearm includes the "keep[ing]" of a firearm within the meaning of the Amendment. *See* Def.'s Mot. at 3-4. As to Defendant's first assertion, the Government does not dispute that, as a United States citizen, Defendant is part of "the people." While cognizant of arguments suggesting that a limited definition may apply, *see Vincent v. Garland*, 80 F.4th 1197, 1202-04 (10th Cir. 2023) (Bacharach, J., concurring), *petition for cert. filed*, No. 23-683 (U.S. Dec. 26, 2023), this Court assumes and accepts that the plain text of the Amendment extends to Defendant. *See District of Columbia v. Heller*, 554 U.S. 570, 580-81 (2008) (stating that the term "the people" in the

Second Amendment "unambiguously refers to all members of the political community, not an unspecified subset.").

As to Defendant's second assertion, the Government contends that § 922(n)'s prohibition on a person under indictment "receiving" certain firearms falls outside of the Second Amendment's protection on a person keeping and bearing arms. *See* Gov't's Resp. at 4-7. The Government argues that § 922(n) "does not infringe on the right of a person to either have a weapon or to carry it on their person" because "so long as an individual receives [a] firearm prior to being indicted (or . . . knowing they were indicted and that their receipt of a firearm is illegal), then they may keep and bear that firearm." *Id.* at 4.

Keeping a firearm is consistent in meaning with possessing a firearm. *See United States v. Rahimi*, 61 F.4th 443, 454 (5th Cir. 2023) ("'[P]ossession is included within the meaning of 'keep.'"), *cert. granted*, 143 S. Ct. 2688 (U.S. June 30, 2023). And because possession is the necessary product of receipt, Congress cannot prohibit a person from receiving a firearm without simultaneously infringing on the person's right to possess the firearm. *See Ball v. United States*, 470 U.S. 856, 862 (1985) ("When received, a firearm is necessarily possessed." (alteration and internal quotation marks omitted)). Accordingly, the Court rejects the Government's argument and concludes that Defendant's receipt of a firearm is conduct presumptively protected by the Second Amendment.

    B.  Whether 18 U.S.C. § 922(n) Is Consistent with the Nation's Historical Tradition of Firearm Regulation

In *Bruen*, the Supreme Court instructed that when a statute regulates conduct that is presumptively protected under the plain text of the Second Amendment, as § 922(n) does

here, the Government in order to establish the constitutionality of the statute must demonstrate that it is consistent with this nation's historical tradition of firearm regulation. *See Bruen*, 597 U.S. at 24-25.  To satisfy this burden, the Government is required to "identify a well-established and representative historical analogue" to the law at issue. *Id.* at 30 (emphasis omitted).

The Government acknowledges that there was no federal or state law in existence at the time of the ratification of the Second Amendment that is exactly comparable to § 922(n).  That type of exact comparator is not necessary, though.

Courts have differed regarding the level of generality that should be employed in conducting the analogical inquiry required by *Bruen*.  This Court finds *Bruen*'s description of the purpose of the analogical inquiry to be instructive, as well as the "metrics" set forth in *Bruen* for how it should be conducted.  As explained by the Supreme Court, the reason for an analogical inquiry is not to implement a pass-fail test based on "a historical twin," *id.* at 30 (emphasis omitted), but to provide a tool of interpretation—specifically, to assist courts in discerning the original public meaning of the Second Amendment by "delimit[ing] the outer bounds of the right to keep and bear arms," *id*. at 19.  To that end, because the Second Amendment "codified a right inherited from our English ancestors," historical evidence of the scope of the English right is probative of the scope of the American right as understood at the time of its adoption. *Id.* at 20 (internal quotation marks omitted).  Most significantly, because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them," historical evidence of the laws in place during the Colonial and Founding Eras speaks to how the Second Amendment

6

was understood when written. *Id.* at 34 (emphasis and internal quotation marks omitted). And, because the "public understanding of a legal text in the period after its enactment or ratification" can be illustrated by the statutes implemented in reliance on that text, historical evidence of this country's regulation of firearms after adoption of the Second Amendment may also be probative of the meaning of the Amendment as understood at the time of its adoption. *Heller*, 554 U.S. at 605 (emphasis omitted); *see Bruen*, 597 U.S. at 34-39.[3]

This type of inquiry is, by its terms, directed to categorical principles of permissible regulation. The guideposts set forth in *Bruen* for conducting the analogical inquiry reinforce this view. In *Bruen*, the Supreme Court explained, "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry." *Bruen*, 597 U.S. at 29 (emphasis and internal quotation marks omitted). Thus, in determining whether regulations are "relevantly similar under the Second Amendment," courts are to consider "two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* The directions that a modern statute need only be "relevantly similar" to a historical statute and "comparabl[y] burden" the right to keep and bear arms in order to fall within the scope of traditional

---

[3] The Supreme Court cautioned, however, that "not all history is created equal" and that courts "must . . . guard against giving postenactment history more weight than it can rightly bear." *Bruen*, 597 U.S. at 34-35.

firearm regulation likewise reflect a search for categorical principles of permissible regulation.

Methodologically, then, *Bruen* directs that courts consider regulations enacted before, during, and after adoption of the Second Amendment as a means of defining the areas in which it was understood, at the time of ratification, that Congress remained empowered to regulate firearms. Here, having conducted such an inquiry, the Court concludes that § 922(n), in prohibiting certain firearms transactions by persons under felony indictment, falls within a category of firearm regulation consistent with this nation's historic tradition: disarming persons who, in contrast to "law-abiding citizens," *id.* at 38, have been deemed as a result of their criminal conduct—including accused criminal conduct—to pose a risk of danger to themselves or others.

As a first step in this inquiry, the Court accepts that prohibiting the possession of firearms by persons *convicted* of felony crimes—as done, for example, in 18 U.S.C. § 922(g)(1)—is consistent with this nation's historical tradition of firearm regulation. The Tenth Circuit recently held that *Bruen* did not supersede the Tenth Circuit's prior determination that 18 U.S.C. § 922(g)(1) is constitutional. *See Vincent*, 80 F.4th at 1201 (concluding that "*Bruen* did not indisputably and pellucidly abrogate" the circuit court's decision in *United States v. McCane*, 573 F.3d 1037 (10th Cir. 2009)). Other courts to consider the issue have expressly concluded that this type of prohibition survives *Bruen*'s test. *See*, *e.g.*, *United States v. Jackson*, 69 F.4th 495, 501-06 (8th Cir. 2023); *United States v. Coombes*, 629 F. Supp. 3d 1149, 1156-62 (N.D. Okla. 2022). These courts, analyzing English laws in the Colonial Era and American laws in the Colonial and Founding Eras

8

have found historical support for disarming persons who have engaged in criminal conduct in order to protect the public. *See Jackson*, 49 F.4th at 504 (finding, upon analysis of historical laws and commentary, that "history supports the authority of Congress to prohibit possession of firearms by persons who have demonstrated disrespect for legal norms of society"); *Coombes*, 629 F. Supp. 3d at 1156-60 (describing historical laws "designed to protect the virtuous citizenry . . . through disarmament of the less virtuous").[4]

Section 922(n) and § 922(g)(1) share a common purpose and, insofar as federal law, a common history. The Federal Firearms Act of 1938 was the first federal statute limiting the right to access firearms for persons indicted for, or convicted of, violating the law. *See* Pub. L. No. 75-850, § 2(e), 52 Stat. 1250, 1251 (repealed) (prohibiting individuals under indictment for, or convicted of, a crime of violence from shipping or transporting certain firearms or ammunition); *id.* § 2(f), 52 Stat. at 1251 (repealed) (prohibiting individuals convicted of a crime of violence from possessing certain firearms or ammunition). The reason for these prohibitions is self-evidently the same: protecting the public from persons deemed dangerous because they have committed crimes. *See United States v. Quiroz*, 629

---

[4] These holdings are consistent with, and rely on, statements in recent Supreme Court decisions. In *Heller*, the Supreme Court identified "longstanding prohibitions on the possession of firearms by felons" as an example of "presumptively lawful regulatory measures." 554 U.S. at 626-27, 627 n.26. In *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality opinion), the Supreme Court reiterated the assurance that the Second Amendment permits the disarming of convicted felons. In *Bruen*, although the Supreme Court did not expressly address the constitutionality of felon dispossession statutes, neither did it "appear to question" that such a prohibition would be permissible. *Vincent*, 80 F.4th at 1201 (noting that in various concurring opinions filed in *Bruen*, "six of the nine Justices pointed out that *Bruen* was not casting any doubt on" *Heller*'s assurance that such a prohibition is constitutional).

F. Supp. 3d 511, 521 (W.D. Tex. 2022) (observing that § 922(n) addresses "the societal fear that . . .those under indictment . . . [will] make an unlawful use of their firearm" (alteration and internal quotation marks omitted), *appeal filed*, No. 22-50834 (5th Cir. Sept. 21, 2022)).

It follows, then, that the "why" of § 922(n) is comparable to that of historical laws found to be consistent with the nation's history of regulating firearms. The resulting question is whether the "how" of § 922(n) is similarly comparable to relevant historical laws. *See Bruen*, 597 U.S. at 29. The central difference between § 922(g)(1) and § 922(n) is that the latter applies to persons merely accused, by indictment, of committing a felony crime rather than to those who have been adjudicated guilty of a felony crime. Thus, the Government must show sufficient historical support for the Court to conclude that the category of permissible regulation underlying § 922(g)(1)—protecting the public from persons deemed dangerous because they have committed crimes—extended to persons merely *accused* of violating the law.

The Government points to surety laws discussed in *Bruen* as a historical analogue to § 922(n). *See* Gov't's Resp. at 9-15.[5] The Court agrees that these statutes, while not a

---

[5] The Government also cites Massachusetts' Disqualifying Act, passed in February 1787 in response to Shays' Rebellion. *See* Gov't's Resp. at 8-9; 1787 Mass. Acts 555, ch. VI (the "Disqualifying Act"). Under the Disqualifying Act, a rebel was required to deliver his arms to a justice of the peace and to take an oath of allegiance in order to secure a pardon for his treason. *See* Disqualifying Act at 555. After three years, the former rebel would be eligible for the return of his arms if he had complied with the conditions set forth in the Act. *See id.* at 556. The Court finds that the unique historical context surrounding the Disqualifying Act and the purpose for which it was enacted makes that Act a poor comparator for a general criminal law such as § 922(n).

perfect match to § 922(n), reflect an understanding, at the time of the adoption of the Second Amendment and in following years, that government officials could lawfully interfere with a person's right to keep and bear arms on the basis of an accusation that the person had committed or posed a risk of committing a serious crime.

As described in *Bruen*, surety laws as they existed in the 1800s allowed local officials to disarm a person carrying a weapon in public "if another could make out a specific showing of 'reasonable cause to fear an injury, or breach of the peace.'" *Bruen*, 597 U.S. at 56 (quoting Mass. Rev. Stat., ch. 134, § 16 (1836)).  The authorization to seize the accused's weapon was qualified: the "accused arms-bearer could go on carrying without criminal penalty so long as he posted money that would be forfeited if he breached the peace or injured others—a requirement from which he was exempt if he needed self-defense." *Id.* at 56-57 (alteration, emphasis, and internal quotation marks omitted).

Several courts have found that these surety statutes are analogous to § 922(n). *See, e.g.*, *Kays*, 624 F. Supp. 3d at 1267-68; *United States v. Adger*, No. CR-122-102, 2023 WL 3229933, at *4 & n.3 (S.D. Ga. May 3, 2023) (R. & R.), *adopted*, 2023 WL 3627840 (S.D. Ga. May 24, 2023).  But this view is not unanimous.  *See United States v. Hicks*, 649 F. Supp. 3d 357, 365-66 (W.D. Tex. 2023), *appeal filed*, No. 23-50030 (5th Cir. Jan. 12,

2023); *United States v. Stambaugh*, 641 F. Supp. 3d 1185, 1190-93 (W.D. Okla. 2022); *Quiroz*, 629 F. Supp. 3d at 520-21.

Citing these and other dissenting authorities, Defendant argues that historical surety laws "differ from [§] 922(n) in process, substance, and burden." Def.'s Mot. at 5.[6] While it is certainly correct that there are substantive differences between these surety laws and § 922(n), the relevant similarity is that they authorize governmental infringement upon an accused's right to keep and bear arms while he or she stands accused. Further, the respective laws impose comparable procedural hurdles that must be met before the accusation is accepted and action may be taken. In the example of the surety statutes, "an individual's Second Amendment right 'could be burdened only if another could make out

---

[6] Citing *Stambaugh*, Defendant also argues that the specific variants of surety laws discussed in *Bruen*, the first of which was adopted in 1836, are too distant from ratification of the Second Amendment to speak to the meaning of the Amendment as understood at the time of ratification. *See* Def.'s Mot. at 4-5; *Stambaugh*, 641 F. Supp. 3d at 1191 (reasoning that mid-nineteenth century surety laws discussed in *Bruen* were "too far removed from 1791"). The *Stambaugh* court noted, however, that it was expressly limiting its analysis to the particular "surety statutes from the mid-nineteenth century" identified as historical analogues by the Government in that case. *Stambaugh*, 651 F. Supp. 3d at 1190. Other scholarship reflects that surety powers were adopted in England and America prior to the specific statutes relied on by the Government in *Stambaugh*. As noted in *Bruen*, English legal treatises in the 1700s construed English common law, including as derived from the Statute of Northampton, to authorize justices of the peace to seize arms carried in public "'with such Circumstances as are apt to terrify the People.'" *Bruen*, 597 U.S. at 45-46 (citing Serjeant William Hawkins, 1 *Pleas of the Crown* 136 (1st ed. 1716)); *see also* 4 William Blackstone, *Commentaries on the Laws of England* 149 (10th ed. 1787). In America, Colonial Era and Founding Era treatises likewise explained that justices of the peace could seize the arms of persons who carried them in a manner that spread fear or terror. *See*, *e.g.*, James Davis, *The Office and Authority of a Justice of Peace* 5 (1774) (N.C.); William Waller Hening, *The New Virginia Justice* 18 (1795) (Va.); *see also United States v. Rowson*, 652 F. Supp. 3d 436, 467-68 (S.D.N.Y. 2023) (discussing Colonial Era precursors to the nineteenth-century surety laws).

12

a specific showing of reasonable cause to fear an injury, or breach of the peace.'" *Kays*, 624 F. Supp. 3d at 1268 (quoting *Bruen*, 597 U.S. at 56).  And for § 922(n), the accusation generally must be made through an indictment, which requires a grand jury to find there is probable cause to believe that the defendant committed a crime.  *See* 18 U.S.C. § 922(n); *Rowson*, 652 F. Supp. 3d at 469 ("Section 922(n) similarly applies only to a subset of persons—felony indictees—as to whom probable cause has been found, by a grand jury or its prosecutorial equivalent in the context of a consented-to felony information, to have committed a serious crime.").

"[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Bruen*, 597 U.S. at 30.  While 18 U.S.C. § 922(n) is not in and of itself "a dead ringer" for the surety laws cited by the Government, *id.*, the Court finds that laws enacted before, during, and after ratification of the Second Amendment establish a historical understanding that Congress remained empowered to disarm persons deemed dangerous because they committed crimes and that the surety laws reflect that this power extended to disarming persons accused, in some reliable way, of violating the law or presenting a danger to the public.  The Government has therefore satisfied its burden of demonstrating that 18 U.S.C. § 922(n) is

consistent with this country's historical tradition of firearm regulation. The Court declines to hold that § 922(n), on its face, violates the Second Amendment.[7]

## CONCLUSION

For these reasons, Defendant's Motion to Dismiss Indictment (Doc. No. 22) is DENIED.

IT IS SO ORDERED this 2nd day of January, 2024.

_____
CHARLES B. GOODWIN
United States District Judge

---

[7] The Court notes that Defendant has brought only a facial challenge to § 922(n). Accordingly, the Court has considered Defendant's challenge under the standard for a facial challenge, namely that he must show that no set of circumstances exists under which § 922(n) would be valid. *See Wash. State Grange*, 552 U.S. at 449; *United States v. Salerno*, 481 U.S. 739, 745 (1987). Therefore, the Court does not reach the question of whether § 922(n) would be unconstitutional as applied, for example in the case of persons accused of nonviolent felony crimes or persons whose indictment was the product of inadequate process. Those are not arguments made here; nor would they appear to be available to Defendant in this case, who was subject to a deferred sentence following his plea of guilty to violent crimes.